May it please the court, Thad Spaulding on behalf of the appellant Regina Goldston. This is a case, unfortunately, that this court all too frequently encounters. It's a 1983 death case that reaches this court on summary judgment. In less than about 30 seconds, Officer Anderson came on the scene that he knew very little about. And by the end of those 30 seconds, he had fired nine shots at point blank range into Kelvin Goldston, who was sitting in the cab of his pickup truck. There is, and these were our allegations from the outset, he was unarmed. There's no question that he was unarmed. And he was no threat to the public or either of the- Unarmed unless you consider the automobile a weapon. That's correct. He did not have a gun on him. And so that is not an issue here. He is in the pickup truck. Are the officers chargeable with knowledge that he's unarmed? Because I believe there was some testimony about him reaching for either the shade or something in the vehicle that might have indicated a reach for a weapon. Yeah, Officer Anderson states at one point that he saw him reaching, but- Because you're right, we do get a lot of these cases, and with some frequency, they involve a mistake because the officer is not aware that the deceased doesn't have a weapon. But it would appear to a reasonable officer that either somebody is reaching for the belt or reaching inside a coat, and I think that's the chargeable knowledge, is it not? Well, but I think the issue here, and going back to what Judge Jolly said, is probably the only real weapon issue is the truck, because Officer Anderson, even in his affidavit, never attributes him reaching for what may or may not have been a weapon as the act or as what prompted him to open fire on him. So the issue really is whether, and the district court found that the conduct was objectively reasonable. It did not reach the other issue that frequents this is whether- that this individual had also dragged another officer down the highway in his truck earlier? Yes, Officer Stratton was aware that he had, and that was one of his outstanding warrants, that he had run into another Benbrook police officer, and I believe that had been conveyed prior to this event to Officer Anderson. What kind of record did this man have that was known to these two officers? From the limited record that we have, that is all I know of. There is that warrant that was aggravated assault of a public servant. There were some other outstanding warrants that I don't recall being very- that were specified in this record. No previous convictions? I'm sorry? No previous convictions? Not that I'm aware of from this record. And so, in fact, even Officer Stanton, in the event that occurred on this day was a stakeout by Officer Stanton, or Officer Stratton, apologies, Officer Stratton who believed that, just only believed that there was drug activity going on at this house. What about the Benbrook incident about the dragging from the vehicle? Is that something that would play a role in the officer's knowledge as they approach this situation? I think it should play a role in the officer's knowledge as they approach this situation, and I think it plays a very important role in Officer Stratton and what she says in her affidavit as far as whether it is internally inconsistent with what a police officer would have done under these circumstances and whether it actually will provide or can provide conclusive proof that she was, in fact, hit by the vehicle or in between the vehicle or even outside of the vehicle at any point during this event. And that becomes the operative, I think, the operative event in this case because the district court found that Officer Anderson was justified because there was a threat to the public, there was a threat to Anderson himself, and there was a threat to Officer Stratton. I don't think there's any evidence that, and we laid this out in the brief, that there's any evidence that there was any threat to the public. There was some reference to a busy street that Officer Anderson comes off of. Mr. Goldson is sitting in his truck facing the exact opposite direction towards a street that goes back into the neighborhood. As you can see from the video, when he's coming down the street, there's nobody on the street. There's no pedestrians. There's no other police officers around except for Officer Stratton who's around the corner. And there's no— What is the evidence with respect to the speed with which he was backing up at the time that the officer fired into the truck? There's no evidence. Did the officers claim that he was backing up or that it was standing still or that he was backing up in a fast way to ram Officer Stratton? The officers claim that the truck started moving backwards and that at some point there was an impact between Officer Stratton's minivan and the back of Mr. Goldston's pickup. Was there any evidence of what speed this might have occurred by judging the damage to the vehicle? I mean, you can see in the pictures the damage to the vehicle, and there are allegations. But there's no testimony, no expert testimony, that it was moving at 5 miles an hour, 10 miles an hour, to make this kind of impact on this van or something. No, there's no expert testimony in this case. The only testimony in this case are the affidavits or the declarations of Officer Stratton and Officer Anderson. In fact, there is sound on the video where you can hear tire squealing, and Officer Anderson attributes that to Mr. Goldston's truck, although if you look at the pictures, the scuff marks that he identifies in the pictures don't line up with the truck at all. And so I think there's at least, and that gets to the issue here, is there's inferences. You say you can hear the screeching of tires. Where did that come from? What source was that? There could have only been two sources of it, and it's either the truck or it's Officer Stratton's minivan. And so there are two sources of, because based on this record, those are the only two vehicles that are moving. The minivan was not directly behind the deceased's vehicle? At the end of this encounter, it was at an angle behind the truck. The passenger side rear bumper is right next to the minivan's passenger side door. Well, did the minivan driver, who is Officer Stratton, testify that she had moved the car from the time that she first came up there? She testified that she pulled directly behind the truck. When he first came up there. When she first came up there, yes. And then she went around to the door and asked him to open the door, rolled the window, and he refused to do it. Is that correct? No, no. Officer Anderson is standing next to the driver's side window of where Goldston is the entire time. Officer Stratton pulls behind Goldston's truck and, according to her, is concerned about an encounter between Goldston and Anderson. And so her testimony is that she gets out of her van and rather than run around to where Officer Anderson is, around the front of the van, keeping the van between her and the truck of someone that she knows has run over an officer before, she claims that she went the long way, went back around the back of the van, came around the passenger side of the van, directly in between the truck and the van, and then claims at that point that the truck sped up and she had to either leap out of the way or got knocked out of the way, and that's where she claims she got hurt. So I think those are internal issues. Is there any evidence that contradicts her story? I mean, circumstantial or other evidence that contradicts her story that she had to jump out of the way? Well, there's no evidence. There are, I think, the physical evidence of the damage to the truck and the location of the truck next to the van and the way the damage is to the truck indicates that she was pulling her van up either against the truck or as the truck was moving back because the damage to the minivan begins just behind the rearview mirror. So you can test her testimony that she was even out of the van at that time? That's correct, because first there's the physical damage, the pictures that Anderson submitted into the record, and there's also the testimony of Alicia Helton, who was in the house directly in front of the house where Goldston was parked in front of, and she testified that when she came out, she heard an impact. She came out, heard the shots being fired by Officer Goldston, and then she testified she saw Officer Stratton come around out of the van. Now, the district court disregarded that testimony. After the shots had been fired? After the shots had been fired. And the district court disregarded that. Now, that testimony was put into the record by Officer Anderson. And then the district court disregarded that testimony, number one, without there being any argument on the part of Officer Anderson to declare that it was hearsay, inadmissible hearsay. And then second, the district court said that it wasn't specific enough. That, first of all, unobjected to hearsay can always be considered to the extent it has some probative value in here. But did you produce this witness? His girlfriend, whoever it was. Right. Did you produce her as a witness? Well, they introduced the recorded statement that the police, that Fort Worth police officers took approximately 20 or 30 minutes after this incident occurred. And nothing, she was not put on as live testimony? No. Or separate declaration or anything? That's correct. Okay. Because the record, the testimony, it had already been put in the record by Officer Anderson, which under the summary judgment standards that apply, would need to be construed in favor of the plaintiff and would certainly give some indication that she's not ever out of the van, as she claimed. So without there being a risk to the public, without there being a risk to Anderson based on the vehicle, without there being a risk to Officer Stratton, then it can't be declared objectively reasonable as a matter of law. So the summary judgment should be reversed. That was the only issue that the district court reached. On appeal, there's been a lot of briefing attributed to, and this court has dealt a lot with already, whether it applies or whether it violates clearly established law. The issue here, especially on summary judgment, is the distinction between a no-threat case and a case in which there is some evidence, or at least undisputed evidence, that there is some threat at issue here. So what's your closest case for a violation here? Our closest case is under the no-threat rationale as Garner, the U.S. Supreme Court case of Garner. Now, I know that there is a lot of debate as to whether that is close enough or too general, but as the court and I— Well, the Supreme Court has told us that repeatedly. Right. But it's not close enough unless—I mean, these facts are not Garner's facts. No, they're not, but what these facts are, especially in light of Cole, which I understand has been argued on mock rehearing, but according to Cole, where you're talking about a no-threat case, especially where the facts are disputed as to whether there is in fact a threat, that Garner is still specific enough. And because a deadly force case is always constrained and is constrained by Garner, and Garner says if there's no threat, then you can't use deadly force. Thank you. Thank you. You just have time for rebuttal. Mr. Jeffrey. Thank you, Your Honor. My name is Jim Jeffrey. I have the honor of representing Officer Anderson and appearing before this Court on his behalf. I'd like to start with the brief discussion of Garner and Cole. As this Court knows, Cole, the mandate on Cole has been withdrawn because it's under consideration. It has been since May 14 when I argued it on mock panel of the Court. Cole uses an obvious case analysis, and nowhere in the plaintiff's briefing here is there a reference or discussion of the obvious case analysis. The obvious case analysis has its origins in civil cases in Hope v. Pelzer, and Hope v. Pelzer refers to U.S. v. Lanier. Hope v. Pelzer is not a dynamic, fast-moving event. That's an Alabama prisoner that was strapped or handcuffed to a hitching post for hours. The U.S. v. Lanier case, which is a criminal prosecution, basically in that case the Court stated that an obvious case, and that's, again, the origin of the obvious case analysis, and the example they gave of an obvious case analysis is there's never been a case where a court held that selling a foster child into slavery is prohibited by the Constitution, but that's an obvious case. So you have the origin of the obvious case analysis coming from non-dynamic events. And in Hope v. Pelzer, the Supreme Court says you only use the obvious case analysis unless courts, you only use it if courts haven't left open the possibility of clearly established law being applicable to certain particular facts, and in a situation where the particular facts have not been held to be violative of a constitutional right, then you have to use a particularized facts analysis. And that is particularly applicable in the Fourth Amendment context, especially in dynamic, fast-moving events like what we have here. And the U.S. Supreme Court in the city of Escondido v. Emmons earlier this year said that the obvious case analysis is rare, and District of Columbia v. Wesby last year, the U.S. Supreme Court said the obvious case analysis is rare, and in both of those cases using Fourth Amendment analysis, they say you have to look to the particularized facts. And I think it's as many as 15 times in the last five years the Supreme Court has reversed lower courts that did not use a particularized fact analysis, and I'm not aware of any authority where the obvious case analysis has been used in a dynamic event by the Supreme Court. So Garner, which has no resemblance to the facts here, a teenager who had committed a burglary, a minor burglary of an unoccupied shed, was shot in the back of the head as he fled into nighttime darkness, and he was not suspected of being dangerous or armed. Here we have a man driving, who's known to have hit and dragged another police officer. That's why they're trying to arrest him on a warrant. He's at a suspected drug house. There's drug warrants out for him, and Officer Anderson explains that people that are known to be involved in drug dealing or at drug houses are often believed to be armed and can be dangerous. So you have two suspected dangerous characteristics of this man before there's even an encounter. And then I would urge the court to pay careful attention to what actually Ms. Helton said. And, yes, I put that into the record. I didn't want any accusation that the officers were hiding something and we did not have access to her. But I'd like you to consider what Ms. Helton actually said, and the court has the recording of her statement. In the record, the recording is at 3.04, and at counter numbers 1.03 to 1.04, she has said to the officer, I heard the boom of the two cars hitting each other. Then I went to the window and looked out. Boom of the two cars hitting each other, and then I went to the window and looked out. At that point, after the boom of the cars hitting each other, she says, saw a lady come around from the other side looking. That's after the collision of the vehicles, not while the lady's sitting in it. And Judge Means correctly pointed out Ms. Helton never said she saw Officer Stratton getting out of the van. A little further on, Ms. Helton is describing what she saw after she heard shots. And then the lady that was on the other side, she was coming out the van by then, and then she was done, went around the van and was looking like he was, you know, good. And that's when they opened the door. And that's at the recording, it's in the record at 3.04, counter numbers 1.44 to 1.56. She never, Helton never said, I saw her getting out of the van. When she saw her, she was already out of the van. When she first saw her, the collision between the vehicles had already happened. The plaintiff has argued at the trial court and here in their briefing that there's no evidence that Ms. Stratton, Officer Stratton, was already out of the vehicle other than the testimony of the two officers that they describe as interested witnesses that shouldn't be believed. But the plaintiff ignores Officer Stratton's medical records that are in the record demonstrating substantial injuries. The plaintiff overlooks the Fort Worth record mandated by state law for employees injured in the line of duty or on the job. It's a worker's compensation report that the employer has to file with the state. That was filed reporting an injury from a pickup hitting her. And it's dated, the date of the accident is the date of the incident here. So, yes, there is corroborating evidence in the record. I'd urge the court to actually look at the scuff marks or skid marks that are in the pictures. You know, it's been told here today that those skid marks don't line up with the pickup truck. Well, the court can decide for itself whether they do or don't. Officer Anderson explains, and he was there when it happened. He said that the scuff marks at pictures in the record at 250 to 253 are from when Goldston's wheels were spinning. And those scuff marks are near the rear tires. And Anderson explained after the impact between the vehicles, the vehicles bumped. They hit and they bumped. So the fact that there may not be precise linear linkage or lineup between the scuff marks, they're a little bit offset from the rear tires, but there's no other scuff marks depicted in those pictures, none near Stratton's vehicle, none anywhere else. So that's what the record says. And Judge Jolly, in the Hathaway v. Bazzani case that you wrote in 2007... I remember it well. ...the court rejected... I'll tell you about it. I'll remind you. The court rejected an attempt by a plaintiff to inject stealth evidence into the record. The plaintiff's family member was a police officer and he gave some so-called expert opinions about the position of the vehicle that his son was riding in when the officer fired shots at him. And he gave a performance evaluation of how the car would work in that situation and the position of the vehicle and the position of the driver. And this court, in your opinion, rejected that attempt to put in stealth evidence because there was no evidence in the record to back up the father's opinions and he was not shown to be an expert. Well, here we don't even have an expert from the other side trying to prove up this conjecture about, oh, in the trial court they referred to it being a front-wheel drive vehicle, model year, so-and-so. There's no evidence in the record about the minivan's model year or type of drive train or how that would affect the operation of the vehicle. And we objected to that. They didn't put it in their briefing because I think that's so ridiculous. But there's no evidence at all from the other side to substantiate their claim, their idea, that Stratton wasn't in her vehicle. And they ignore the medical records and the workers' compensation report demonstrating she was injured, just like she said she was. And, yes, everything did happen. Anderson got to the scene. He gave 11 commands to Goldston that Goldston ignored. And Goldston, in the record at page 335, Goldston states in their trial court briefing that he was trying to flee. He was trying to flee. And that's when you hear the engine RPMs. Where does that appear? That's at record page 335. Did he testify? No, plaintiffs' arguments, their pleadings at page 335. He did, yeah. And they stated, yes, Mr. Goldston is deceased. But the plaintiffs stated in their trial court briefing and pleadings at page 335 that Goldston was trying to flee the scene. And now we have it that Goldston was the one that hit. They keep telling a different story without any evidence to back it up. Almost every time they tell it, the story changes. And judge means recognize that and didn't buy into it. So now we're hearing that not only at the trial court Goldston was trying to flee because he was scared of the cops, but now we hear he was stationary and the cops ran into him, but there's no evidence of that. And I would submit under any construction of the record, regardless if the court wants to be indulgent and accept the plaintiff's version that Goldston, while revving his engine, and they even point to the recording at .109-110 or counter 109-110 in the record, that they say you can hear his RPMs as he's increasing the speed, and as they say at record 335, because he's trying to flee. Even if the court indulges the plaintiff and says, well, he's not trying to flee, he was the one that was hit or that Stratton hit him, you have the impact between the vehicles. You have the man not cooperating. He is trying to leave the scene. And that's dangerous to Anderson, who's standing close enough to him at the time this all happens that he's reaching out with his gun and trying to break the window so he can reach in and try to get the door unlocked. That's how close Anderson is. If Stratton's sitting in her vehicle when the impact happens, that's still dangerous. And I'd point to the fact it's undisputed in the record, and she even says on the recording, you can hear Stratton calling, Lane, get up here. It's transcribed as Lane, but we explained that was probably Wayne, one of the other officers nearby. So both officers know other officers are coming to the scene. At the beginning of the video, as Judge Means points out, you have four lanes of traffic. It's bumper-to-bumper busy traffic a block away, and that's the direction Goldston's trying to back up to flee. If he gets out fleeing from the officers, it is in fact dangerous. It's dangerous what he did, regardless of whether Stratton's in or out of the vehicle. It's dangerous to Anderson, who's standing right there. The vehicle's recognized in case law we cite in the briefing as a deadly weapon, and he is doing something that is eminently deadly dangerous to not only Anderson standing next to him, but to Stratton, in or out of her vehicle, of course she was out of it and hit, and the public a block away. So under the circumstances in the court, Judge Ho asked, what's your best case? Garner, an unarmed teenager stealing a bag of potato chips who's shot in the back of the head. That's nothing to do with this case. But if you look at the cases that we point to, Brousseau v. Hagen, a Supreme Court case with strikingly similar facts, where the officer was granted qualified immunity because the law wasn't clearly established to prohibit shooting the driver of a Jeep as he drove past the officer. There was nobody else in the path of that vehicle. She feared, the officer in that case feared, that other officers were in the area and coming to the scene, and this man was trying to flee, and she shot him in the back and was entitled to qualified immunity. I'd also point you to the Long v. Slayton case, an 11th Circuit case we cite in our briefing. Suspect stole a police car. He was warned he'd be shot. He refused to stop. He was in his own driveway. The police had been called to his house on a mental health problem, and while the officer's dealing with the suspect's father, the suspect gets in the police car and is trying to back away. He's backing down the driveway, and the officer shot him because he feared if the suspect had gotten out of the driveway to a public street that that would be a danger to the public. So in the 11th Circuit, there was no Fourth Amendment violation for that kind of conduct. And then, of course, the Hathaway v. Bazzani case, the juvenile driving a high-powered Mustang, swerves first at the officer, away from the officer, then back at the officer, and then he's shot, and there was no Fourth Amendment violation there. Counsel, should we make anything of the... shots, I believe, in this case? Is this just a question of degree at this point, or is there an excessive force issue in terms of how much force is used? It doesn't matter how many shots were used, Your Honor. First of all, it's a terrifying situation for an officer to be in. All of those shots were fired in less than three seconds. The record clearly shows that. And he didn't empty his gun. He had a 13-round available. He used nine shots. He stopped firing when the threat stopped. And the... I forget the name of the case. We cite it. I cite it in the briefing. But this Court has, in another case, considered the number of shots fired, and, hell, it didn't matter. I think in the other case there were 15 shots, maybe, 14 or 15. I don't know. Deadly force is deadly force. Deadly force is deadly force. Whether it's three shots or nine shots. You could fire three shots, and that could be too many if the threat has stopped. And this Court has dealt with that scenario because there was a pause. Allegedly there was a pause, and the suspect was disabled and no longer a threat, and the accusation was, boom, another shot was delivered. But these were continuous shots, and the undisputed testimony is I started firing when there was a threat. I stopped when the threat stopped. So the number of shots doesn't matter. And I would like to point out very briefly that the plaintiff has challenged the district court's exercise of discretion to deny discovery. I gave a Rule 28J letter brief late last week because I came across a case that was written after our briefing was filed in this case. It's Shepard v. City of Shreveport. It wasn't a denial of discovery, but it was a denial in a summary judgment proceeding of a supplementation of an expert report. The denial was for similar reasons that Judge Means found here. There was no explanation of how the expert report would make a difference if it was accepted. And in our trial court briefing and briefing here, we point to the Stearns Airport equipment case. Basically, if you're seeking discovery in a summary judgment proceeding, you have to show why it matters. You know, here's what I aim to get. Here's how that would affect the outcome of the case. Plaintiff hasn't done that either at the district court or here, and they're complaining about the district court's denial of their request for discovery. When the district court imposed an immunity scheduling order, the district court gave the plaintiffs an invitation that if you think you need discovery, seek it under Rule 56D. Plaintiffs waited until after the summary judgment ruling to come in with a vague request for discovery, which they still haven't explained in their briefing here. The trial court was entirely within his discretion to deny that request. And then in the Shepard v. Shreveport case, the other factor the court considered was the docket control. Trial courts have a right to control their docket. And here, all that Judge Means was doing was using the Schulte v. Mississippi's – that's Wix v. Mississippi, I'm sorry – Schulte v. Woods case procedures where you get to the immunity analysis and ruling as early as possible in the case, and if there's a need for discovery, you ask for it appropriately. And that's all he did. And he did not abuse his discretion. I have about 38 seconds left. I'll be happy to answer any further questions. Thank you. Thank you. Thank you. Mr. Spaulding, you've reserved five minutes. The request for discovery is a frustrating part of this case. Contrary to what counsel just said, we had asked even prior to that scheduling order that we be allowed to take some discovery. That's in the record, and I think page 166, 168, we asked for the depositions of the two officers. What evidence were you alleging needed to be explored? Well, we wanted to talk to the only three witnesses to this event. We wanted the depositions of Anderson and Stratton, and we wanted the deposition of Ms. Helton. And this was in response to motions that had been filed by Officer Anderson and when she was still part of this case, Officer Stratton, to stay discovery entirely. In response to that, the court issued the order that counsel spoke about, and in that order the court stayed all discovery. So that was it. When we got, obviously, you know, and he's correct, there's a footnote in there that says, you know, if you think you cannot respond to the motion for summary judgment, then you're going to need to file a Rule 56D motion, and we did not do that. I mean, it's kind of a catch-22 at that point, because then you're looking at a summary judgment that you think is fatal on its face because of internal consistencies and you respond to it. You don't find out about it until the district court issues its ruling, tossing your case. So at that time you ask again, and, you know, here we are. At any point in the opposition to the motion for summary judgment, did you reference 56D and say that, in other words, if you didn't file the motion requesting discovery prior to the court's ruling or your opposition, in your opposition did you state, we avail ourselves under Rule 56D, and if allowed to depose X, Y, and Z, we believe we could establish ABC facts? We did not. Okay. At that point we just responded to the summary judgment motion. But you did have the statements, as I understand it, the statements of Ms. Helton and the two officers? That's correct. Okay. Yeah, and those make up the bulk of the appendix that was filed in support of their motion for summary judgment. Getting back to the clearly established law, the issue becomes dynamic events, but dynamic events that either show, in this case, there are fact issues with regard to whether they really are dynamic events, and whether they are events that create any sort of risk here or any sort of threat. And so as long as there are fact issues with regard to what happened and whether there's a threat to either of these officers, and those are fact issues that cannot be resolved on summary judgment under either prong of this, whether it's an objectively reasonable standard or whether it's clearly established law. Because if it's no threat, there's no threat. And the case law is clear. That can only be a general rule. If there is no threat, then you can't use deadly force. With regard to the evidence, the statement of Alicia Helton, she says at I think 144 of the recording that she saw Stratton coming around out of the van. She doesn't say she saw her in the van, but she says coming out of the van. And under the summary judgment standard, counsel wants him to take, this Court to take his evidence as gospel. But there's got to be, to the extent there are inconsistencies or discrepancies in this evidence, any inferences that can be raised from that have to be taken in the plaintiff's favor. Taking those in the plaintiff's favor, you've got Stratton inside the van. Her medical records don't corroborate anything. Her medical records only, they come from her. When you say the evidence in your favor means Stratton's in the van, what are you citing? Just the general summary. I don't mean case law. I mean what's the record evidence? It's Alicia Helton's statement. That's what you have as the statement? Yeah. Do you have a response to the opposing counsel that she didn't even claim to have seen the situation until after the crash had taken place, after the boom? Oh, no. Yeah, I mean I think she, I think it's correct that she did see the scene after the sound had been made. So, but what the, that made no sense. Let me do that again. He's correct. Her statement is that she heard the crash and then she looked out the window. But if she's looking out, if when she's looking out the window she sees Officer Stratton coming out of the van, that would necessarily imply that Officer Stratton is in the van at the time the collision occurs. Because these are just, there's just seconds that separate these two. We have your argument. The case is submitted. We will take a short break.